### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 1, 2013**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 14-** |
| | : | |
| v. | : | **Grand Jury Original** |
| | : | |
| **EDWARD DACY** | : | **18 U.S.C. § 371 (Conspiracy);** |
| | : | **18 U.S.C. § 1344 (Bank Fraud);** |
| **and** | : | **18 U.S.C. § 1343 (Wire Fraud Affecting a** |
| | : | **Financial Institution);** |
| **ARRENDONDO CONRAD AUSTIN,** | : | **18 U.S.C. § 1341 (Mail Fraud Affecting a** |
| | : | **Financial Institution);** |
| | : | **18 U.S.C. § 2 (Aiding and Abetting and** |
| **Defendants.** | : | **Causing an Act to be Done);** |
| | : | **18 U.S.C. § 982(a)(2)(A), and** |
| | : | **21 U.S.C. § 853(p) (Criminal Forfeiture).** |

## I N D I C T M E N T

The Grand Jury charges that:

### COUNT ONE

### CONSPIRACY

#### Introduction

At all times material to this Indictment:

#### The Mortgage Process

1.     National City Mortgage was a wholly owned subsidiary of National City Bank, which was until November 2009, a financial institution in that its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

2.     MetLife Home Loans ("MetLife") was a wholly owned subsidiary of MetLife Bank, which was a financial institution in that its deposits were insured by the FDIC.

3.     Until March 15, 2008, Resource Bank was a financial institution in that its deposits were insured by the FDIC.

4.     Until December 4, 2009, AmTrust Bank was a financial institution in that its deposits were insured by the FDIC.

5.     Until April 27, 2009, Countrywide Bank was a financial institution in that its deposits were insured by the FDIC.

6.     The following were mortgage companies: Access National Mortgage; Sierra Pacific Mortgage; and Fidelity & Trust Mortgage.

7.     These banks and mortgage companies (collectively referred to as "mortgage lenders" or "lenders") were in the business, among other things, of loaning money to individuals who wished to buy or refinance residential real estate.

8.     Mortgage lenders typically did not lend sufficient money to cover the full purchase price or value of the property; rather, lenders normally required that the buyer use some of his or her own funds for the purchase of the property.  This gave the lenders assurance that the buyer, with some of his or her own money invested in the property, had an incentive to remain current on his or her mortgage payments to avert foreclosure, and that the lender would be able to recover the full proceeds of the loan in the event of foreclosure.  These financial contributions from the buyer were known as an "earnest money deposit," paid after signing the real estate contract, and "cash from borrower" or "down payment," which was paid at settlement.

9.     Buyers would often work with a loan broker, or with a loan officer employed by a bank, to put together the paperwork necessary to obtain a mortgage loan.  This paperwork would typically include items such as:

a.    Real estate contract showing the contract sales price and the earnest money deposit;

b.    Uniform Residential Loan Application listing the buyer's employment, salary, assets, liabilities, and other items;

c.    Verification from an employer that the buyer was employed and earning a particular salary with sufficient monthly income and assets to pay the mortgage ("Verification of Employment");

d.    Copies of tax returns filed with the Internal Revenue Service ("IRS"), a letter from a Certified Public Accountant ("CPA") who had a history advising the buyer (hereinafter referred to as a "CPA letter"), and/or financial statements, in order to assure the lender that the buyer had sufficient monthly income and assets to pay the mortgage;

e.    Verification from the buyer's bank confirming that the buyer maintained a bank account with sufficient cash to make the required cash contribution toward the purchase of the property ("Verification of Deposit"); and

f.    Verification in the form of rental leases that houses currently owned by the buyer would be leased out to renters and generate an income to offset any expenses from owning that property.

10.    Before approving the loan, lenders would also require proof that the seller had title to the property and often asked a settlement company to prepare a letter setting forth the current and previous owners of the property for the prior 24 months. The settlement company was also responsible for preparing the Deed, which transferred legal title from the seller to the buyer, and the Settlement Statement, which was an accounting of the disbursement of the loan money and a listing of cash due from the buyer and to the seller.

11.    If a loan were approved, a lender would instruct a settlement company to prepare for a "closing" or "settlement," that is, a meeting where the buyer and seller would sign the Deed and Settlement Statement, as well as the Note (promise to pay the loan), Deed of Trust (public notice that the property was encumbered with a mortgage), and other documents. The lender would provide the settlement company with instructions on how to secure the lender's interest in

3

the property.

12.     The settlement company would receive the funding from the mortgage lender and the buyer's cash contribution and would be under the obligation to disburse the money only if all of the lender's conditions were met and the buyer's financial contribution collected.  Only then would the settlement company be authorized to release the lender's money, and pay the costs of the closing, the debts of the property or seller, and any other authorized expenses as set forth on the Settlement Statement.

13.     After closing, the settlement company would submit the Deed, Deed of Trust, and any other filings to the District of Columbia's Recorder of Deeds (if the property were in the District of Columbia), with instructions that the Recorder of Deeds officially record the documents in the public records and then send to the lender or return to the settlement company or lender the stamped recorded documents as proof that the documents were filed as required by the lender.

14.     The Federal Housing Administration ("FHA") was a part of the United States Department of Housing and Urban Development.  The FHA provided government insurance to qualified mortgage loans obtained by individuals from private mortgage lenders and banks.

### Defendants

15.     Defendant EDWARD DACY was an agent for a settlement company, identified here as Settlement Company A or "settlement company," and was paid to handle real estate settlements. Defendant DACY held the responsibilities of a settlement agent as explained above.

16.     Defendant ARRENDONDO CONRAD AUSTIN ("CONRAD AUSTIN") was a CPA licensed in the State of Maryland. A CPA was an individual, licensed by an authorizing state or District of Columbia agency, who typically prepared tax returns and other financial documents.

CPAs were required periodically to attest that they had received continuing ethical training to maintain their CPA license. Mortgage lenders often gave deference to documents prepared by CPAs based on the stringent standards required of CPAs to provide accurate analysis supported by detailed documentation.

### The Conspiracy

17.     From at least in or about 2005, and continuing thereafter through at least in or about 2010, in the District of Columbia and elsewhere, defendants EDWARD DACY and CONRAD AUSTIN did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with each other and with other persons both known and unknown to the grand jury to commit offenses against the United States, that is:

   a.     bank fraud, by engaging in a scheme to defraud and obtain money and property from financial institutions and mortgage lenders by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344;

   b.     wire fraud, by engaging in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing and attempting to execute the scheme to defraud, willfully causing an interstate wire transmission, with such scheme to defraud affecting a financial institution, in violation of 18 U.S.C. § 1343; and

   c.     mail fraud, by engaging in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and for the purpose of executing and attempting to execute the scheme to defraud, willfully causing to be deposited mail matter to be delivered by the Postal Service or private and commercial interstate carrier, with such scheme to defraud affecting a financial institution, in violation of 18 U.S.C. § 1341.

### Goal of the Conspiracy

18.     It was a goal of the conspiracy that defendants EDWARD DACY and CONRAD AUSTIN and their co-conspirators would defraud financial institutions, mortgage lenders, and the

FHA of money by obtaining mortgage loans and assisting others to obtain mortgage loans on residential real estate properties through false loan applications and documents and fraudulent settlements, and ultimately causing a loss to the financial institutions, mortgage lenders, and the FHA when mortgages were not paid.

## Manner and Means

It was a part of the conspiracy that:

19.       Co-conspirator Frank Davis, Jr., ("Davis") and co-conspirator Frederick Robinson, Sr., ("Robinson") purchased properties in the names of general partnerships; Davis and Robinson would then recruit individuals to re-purchase these same properties for higher amounts, funded by fraudulently obtained mortgage loans, by promising the buyers that they would not be required to: make financial contributions toward the purchase of the properties; pay the monthly mortgage payments or expenses; or maintain the properties (Davis and Robinson would continue to control the properties after the buyers' purchases).  These buyers are hereinafter referred to as "straw buyers" and include individuals identified in this indictment as "MAF," "FTR," and "RS," among others.

20.       Co-conspirator Howard Tutman ("Tutman") was a loan officer who used his position to assist Davis and Robinson by advising them of the loan application items which would be required to obtain mortgage loans in the names of the straw buyers.

21.       Co-conspirator Lonnie Johnson ("Johnson") was a straw buyer, who, during part of the conspiracy, worked at Wachovia Bank; Johnson used his banking position to assist with creating the false documents needed to obtain the mortgage loans for other straw buyers.

22.       Co-conspirator Pauline Pilate ("Pilate") was a licensed real estate agent who assisted Davis and others by creating real estate contracts she knew to be with straw purchasers in

non-arms-length transactions.

23.     Co-conspirator Cheryl E. Morrison ("Morrison") worked at Settlement Company A and followed the directions of defendant EDWARD DACY.

24.     In order to obtain mortgage loans in the names of some of the straw buyers, Robinson recruited defendant CONRAD AUSTIN to create false CPA letters, inflated tax returns, and unjustified financial statements.

25.     Defendant EDWARD DACY handled the straw buyers' settlement of the properties, with knowledge that the straw buyers did not pay the cash contribution as required by the lenders.

26.     The straw buyers, Davis, Robinson, and others failed to pay the mortgages resulting in the default of the loans, foreclosure of the properties, and banks, mortgage lenders or the FHA losing money after the resale of the property.

27.     Using materially false and fraudulent representations, statements, and documents, defendants EDWARD DACY and CONRAD AUSTIN assisted others to obtain and attempt to obtain mortgage loans to re-purchase properties from the general partnerships through settlements conducted by Settlement Company A, including, but not limited to, the following loans for the following property transactions:

| Property Address | City / State | Straw Buyer | Lender | Loan Amount (Approximate) | Date (on or about) |
|---|---|---|---|---|---|
| 1112 50th Street, NE | Washington, DC | Johnson | MetLife | $216,015 | 1/29/2010 |
| 1202 47th Place, NE | Washington, DC | FTR | Access National Mortgage | $240,000 | 1/15/2009 |
| 1807 M Street, NE | Washington, DC | FTR | Sierra Pacific Mortgage | $232,000 | 2/23/2009 |

| 1807 M Street, NE | Washington, DC | Robinson | National City Mortgage | $284,900 attempt | N/A |
|---|---|---|---|---|---|
| 1933 East Baltimore Street | Baltimore, Maryland | Robinson | National City Mortgage | $379,051 | 7/31/2008 |
| 222 Seaton Place, NE | Washington, DC | RS | Countrywide Bank | $419,200 | 1/9/2008 |
| 226 N Patterson Street | Baltimore, Maryland | Davis | National City Mortgage | $182,400 | 8/4/2008 |
| 2505 Queens Chapel Road, NE | Washington, DC | Davis | National City Mortgage | $300,000 attempt | N/A |
| 2505 Queens Chapel Road, NE | Washington, DC | MAF | National City Mortgage | $276,000 | 8/7/2008 |
| 317 R Street, NW, Unit #1 | Washington, DC | RS | AmTrust Bank | $585,000 | 1/9/2008 |
| 506 N Luzerne Avenue | Baltimore, Maryland | FTR | Fidelity & Trust Mortgage | $140,000 | 1/16/2009 |
| 5639 Southern Avenue | Capitol Heights, Maryland | MAF | Resource Bank | $253,300 | 11/22/2006 |
| 623 Drum Avenue | Capitol Heights, Maryland | Davis | National City Mortgage | $248,000 | 8/7/2008 |
| 826 20th Street, NE | Washington, DC | MAF | National City Mortgage | $300,000 attempt | N/A |
| 826 20th Street, NE | Washington, DC | Robinson | National City Mortgage | $300,000 | 9/26/2008 |

## Overt Acts

28.    In furtherance of the conspiracy and to effect the object thereof, defendants
EDWARD DACY and CONRAD AUSTIN and other members of the conspiracy committed the
following overt acts, among others, in the District of Columbia and elsewhere:

### 222 Seaton Place, NE, Washington, DC

29.     On or about October 12, 2007, Pilate created a real estate sales contract for RS to purchase 222 Seaton Place, NE, Washington, DC ("Seaton Place") from a general partnership controlled by Davis.

30.     Before January 9, 2008, Davis and others caused to be submitted a Uniform Residential Loan Application in the name of RS seeking a $419,200 mortgage loan from Countrywide Bank for the purchase of 222 Seaton Place; the loan application falsely listed RS's employment as a director of sales/construction working with Davis's company and earning approximately $14,800 per month.

31.     On or about January 9, 2008, defendant EDWARD DACY and others at the settlement company handled the closing on RS's purchase of 222 Seaton Place, settling the transaction without collecting the buyer's cash contribution as required by the lender and contrary to the lender's instruction that "Settlement Agent must have received from Borrower cash or other good funds sufficient to pay all amounts shown on the Settlement Statement as payable by Borrower."

32.     On or about January 11, 2008, Johnson sent via facsimile a copy of a cashier's check, purchased by Davis but with the notation that the remitter was RS, to Morrison and defendant EDWARD DACY, pretending to be the buyer's cash contribution for the purchase of 222 Seaton Place.

33.     On or before January 9, 2008, defendant EDWARD DACY created and caused to be created a Deed transferring Seaton Place from a general partnership controlled by Davis to RS.

34.     Between on or about January 9, 2008, and January 16, 2008, in the District of Columbia and elsewhere, defendant EDWARD DACY and Morrison caused an executed Deed to

be filed at the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the deed, the Recorder of Deeds should mail the stamped documents back to Settlement Company A.

35.     On or about January 16, 2008, in the District of Columbia and elsewhere, the District of Columbia's Recorder of Deeds mailed the file-stamped copy of the Deed, referenced above, to Settlement Company A.

36.     At some point after January 2008, Davis, RS, and others failed to pay the mortgage on 222 Seaton Place, resulting in the default of the loan and foreclosure of the property.

## 2505 Queens Chapel Road, NE, Washington, DC

### A.     Davis's Refinance Loan Attempt

37.     In or about June 2008, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of Davis seeking a $300,000 refinance loan from National City Mortgage for 2505 Queens Chapel Road, NE, Washington, DC ("2505 Queens Chapel Road").

38.     On or about June 6, 2008, in the District of Columbia and elsewhere, Davis caused to be sent via facsimile a signed Uniform Residential Loan Application, referenced in the paragraph above from the District of Columbia to the lender in Maryland.

39.     On or about June 10, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile a fake rental lease, purportedly renting out a portion of Davis's primary residence, from the District of Columbia to the lender in Maryland.

40.     On or about June 20, 2008, defendant CONRAD AUSTIN created a CPA letter falsely stating that he had personally advised Davis on a quarterly basis and had been Davis's accountant for the previous two years.

41.     On or about June 21, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the CPA letter, referenced in the paragraph above, to the lender in Maryland as part of the loan application seeking a $300,000 loan on 2505 Queens Chapel Road.

**B.     MAF's Purchase**

42.     In or about July 2008 to August 2008, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of MAF seeking a $276,000 mortgage loan for the purchase of 2505 Queens Chapel Road; the loan application falsely listed MAF's employment as a manager working with Davis's company and earning approximately $10,000 per month, when in fact, MAF did not work for Davis's company and she earned less than $4,000 per month.

43.     On or about July 1, 2008, as part of a loan application for 2505 Queens Chapel Road, Johnson created a Verification of Deposit falsely representing that MAF held approximately $137,000 in cash in her Wachovia Bank account, when in truth she had $100.

44.     On or about July 12, 2008, defendant CONRAD AUSTIN created a CPA letter falsely stating that he had been the accountant for MAF for the previous two years.

45.     On or about July 21, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the CPA letter referenced in the paragraph above, to the lender in Maryland as part of MAF's 2505 Queens Chapel Road loan application.

46.     In or about July 2008 to August 2008, defendant CONRAD AUSTIN created 2007 tax returns for MAF stating falsely that she received business income, failing to claim her employment wages, but falsely listing business income in an amount greatly exceeding MAF's true income. These false tax returns were provided to National City Mortgage as part of the 2505 Queens Chapel Road loan application.

47.     On or about August 7, 2008, defendant EDWARD DACY and others at the

settlement company handled the closing on MAF's purchase of 2505 Queens Chapel Road, settling the transaction without collecting the buyer's cash contribution as required by the lender.

48.     On or about August 8, 2008, Johnson sent via facsimile a copy of a check purportedly written by MAF to Morrison and defendant EDWARD DACY and purporting to be the buyer's cash contribution for the purchase of 2505 Queens Chapel.

49.     On or before August 7, 2008, defendant EDWARD DACY created and caused to be created a Deed transferring 2505 Queens Chapel Road from a general partnership controlled by Davis to MAF.

50.     Between on or about August 7, 2008, and August 14, 2008, in the District of Columbia and elsewhere, defendant EDWARD DACY and Morrison caused an executed Deed to be filed at the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the deed, the Recorder of Deeds should mail the stamped documents back to Settlement Company A.

51.     On or about August 14, 2008, in the District of Columbia and elsewhere, the District of Columbia's Recorder of Deeds mailed the file-stamped copy of the Deed, referenced above, to Settlement Company A.

52.     At some point after August 2008, Davis, MAF, and others failed to pay the mortgage on 2505 Queens Chapel Road, resulting in the default of the loan and foreclosure of the property and a loss of approximately $135,130 after resale of the property.

### 826 20th Street, NE, Washington, DC

**A.     MAF's Loan Attempt**

53.     On or about August 13, 2008, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of MAF seeking a $300,000 loan from National City

Mortgage for the purchase of 826 20th Street, NE, Washington, DC ("826 20th Street, NE"). The loan application falsely listed MAF's employment as a manager working with Davis's company and earning approximately $10,000 per month, when in fact, MAF did not work for Davis's company and she earned less than $4,000 per month.

54.      On or about August 14, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the signed Uniform Residential Loan Application, referenced in the paragraph above, to the lender in Maryland.

55.      On or about August 19, 2008, as part of the loan application for 826 20th Street, NE, Johnson created a Verification of Deposit falsely representing that MAF held approximately $137,000 in cash in her Wachovia Bank account, when in truth she had $100.

56.      On or about July 12, 2008, defendant CONRAD AUSTIN created a CPA letter falsely stating that he had been the accountant for MAF for the previous two years.

57.      On or about July 21, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the CPA letter referenced in the paragraph above, to the lender in Maryland as part of the 826 20th Street, NE, loan application.

58.      In or about July 2008 to August 2008, defendant CONRAD AUSTIN created 2007 tax returns for straw buyer MAF falsely stating that she received business income, failing to claim her employment wages, but falsely listing business income in an amount greatly exceeding MAF's true income; these false tax returns were provided to the lender as part of MAF's 826 20th Street, NE, loan application.

**B.     Robinson's Purchase**

59.      On or about August 26, 2008, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of Robinson seeking a $300,000 loan from National

City Mortgage for the purchase of 826 20th Street, NE.

60.    On or about July 8, 2008, as part of Robinson's loan application for 826 20th Street, NE, defendant CONRAD AUSTIN created a CPA letter falsely stating that he had personally advised Robinson and had been Robinson's accountant for the previous two years.

61.    Between in or about July and October 2008, defendant CONRAD AUSTIN created false 2006 and 2007 tax returns for Robinson.

62.    On or about August 8, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the 2006 and 2007 tax returns, referenced in the paragraph above, to the lender in Maryland as part of the 826 20th Street, NE, loan application.

63.    On or about September 8, 2008, as part of a loan application for 826 20th Street, NE, Johnson created a Verification of Deposit falsely representing that Robinson held approximately $155,000 in cash in his Wachovia Bank account, when in truth he had less than $300.

64.    In or about July 2008 to August 2008, Robinson created or caused to be created Rental Agreements falsely stating that he and his wife would be renting their home in the District of Columbia to others; these false Rental Agreements contained the forged signature of Robinson's wife.

65.    On or about September 25, 2008, defendant EDWARD DACY and others at the settlement company handled the closing on Robinson's purchase of 826 20th Street, NE, settling the transaction without collecting the buyer's full cash contribution as required by the lender.

66.    On or before September 26, 2008, defendant EDWARD DACY created and caused to be created a Deed transferring 826 20th Street, NE, from a general partnership controlled by Davis to Robinson.

67.     Between on or about September 26, 2008, and October 2, 2008, in the District of Columbia and elsewhere, defendant EDWARD DACY and Morrison caused an executed Deed to be filed at the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the deed, the Recorder of Deeds should mail the stamped documents back to Settlement Company A.

68.     On or about October 2, 2008, in the District of Columbia and elsewhere, the District of Columbia's Recorder of Deeds mailed the file-stamped copy of the Deed, referenced above, to Settlement Company A.

69.     At some point after September 2008, Davis, Robinson, and others failed to pay the mortgage on 826 20th Street, NE, resulting in the default of the loan and foreclosure of the property.

### 1807 M Street, NE, Washington, DC

**A.      Robinson's Loan Attempt**

70.     Sometime before October 8, 2008, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of Robinson seeking a $284,900 loan from National City Mortgage for the purchase of 1807 M Street, NE, Washington, DC ("1807 M Street, NE").

71.     On or about October 8, 2008, in the District of Columbia and elsewhere, Robinson caused to be sent via facsimile the signed loan application described in the paragraph above to the lender in Maryland.

72.     On or about July 8, 2008, defendant CONRAD AUSTIN created a CPA letter falsely stating that he had personally advised Robinson and had been Robinson's accountant for the previous two years.

73.     On or about July 8, 2008, defendant CONRAD AUSTIN caused to be sent via facsimile the CPA letter referenced in the paragraph above to the lender in Maryland; this CPA letter was used in support of Robinson's loan application for 1807 M Street, NE.

74.     Between in or about July 2008 and October 2008, defendant CONRAD AUSTIN created false 2006 and 2007 tax returns for Robinson; Robinson and others provided these documents to the lender in support of the loan.

75.     In or about July 2008 to August 2008, Robinson created or caused to be created Rental Agreements falsely stating that he and his wife would be renting their home in the District of Columbia to others; these false Rental Agreements contained the forged signature of Robinson's wife; Robinson and others provided these documents to the lender in support of the loan.

76.     On or about February 12, 2009, defendant CONRAD AUSTIN represented to a special investigator with National City Mortgage that he prepared the tax returns for Robinson and that the income as stated was correct.

**B.      FTR's Purchase**

77.     Sometime before February 2009, Robinson recruited straw buyer FTR to purchase 1807 M Street, NE, and caused FTR to apply for a $232,000 mortgage loan the application for which falsely stated FTR's intent to occupy the property and the source of the down payment as gift funds.

78.     On or about December 21, 2008, as part of the loan application for 1807 M Street, NE, Robinson signed a "gift letter" falsely representing that he had given and would give $75,000 to FTR to be applied for the purchase of 1807 M Street, NE.

79.     On or about December 23, 2008, in the District of Columbia, Robinson caused to

be sent via facsimile the "gift letter" referenced in the paragraph above to the lender in Maryland.

80.     On or about December 22, 2008, as part of the loan application for 1807 M Street, NE, Johnson signed a "gift affidavit" falsely representing that Robinson had sufficient money available to give $75,000 to FTR.

81.     On or about February 23, 2009, defendant EDWARD DACY and others at the settlement company handled the closing on FTR's purchase of 1807 M Street, NE, settling the transaction without collecting the $75,000 in gift funds and without paying the approximate $17,000 to FTR as required by the lender and as certified on the Settlement Statement.

82.     On or about February 24, 2009, Johnson caused to be sent via facsimile a copy of a cashier's check in the amount of $75,000, purporting to be purchased by Robinson, to Morrison and defendant EDWARD DACY.

83.     On or before February 23, 2009, defendant EDWARD DACY created and caused to be created a Deed transferring 1807 M Street, NE, from a general partnership controlled by Davis to FTR.

84.     Between on or about February 23, 2009, and March 5, 2009, in the District of Columbia and elsewhere, defendant EDWARD DACY and Morrison caused an executed Deed to be filed at the District of Columbia's Recorder of Deeds, with the instructions that after the recordation of the deed, the Recorder of Deeds should mail the stamped documents back to Settlement Company A.

85.     On or about March 5, 2009, in the District of Columbia and elsewhere, the District of Columbia's Recorder of Deeds mailed the file-stamped copy of the Deed, referenced above, to Settlement Company A.

86.     Later, in July 2009, Davis and Robinson resold 1807 M Street, NE, to another straw buyer.

### 1112 50th Street, NE, Washington, DC

87.     Sometime before January 29, 2010, Tutman created, or caused to be created, a Uniform Residential Loan Application in the name of Johnson seeking a $216,015 FHA-insured loan from MetLife Home Loans for the purchase of 1112 50th Street, NE, Washington, DC ("1112 50th Street, NE."). A condition of issuing the loan from MetLife Home Loans and insuring the loan by the FHA was that certain liens and bills from the IRS and Ford Motor Company be paid.

88.     On or about January 18, 2010, as part of the settlement of 1112 50th Street, NE, copies of checks payable to the IRS and Ford Motor Company, as well as a check purporting to be gift funds paying Johnson's down payment, were sent via facsimile to Morrison and defendant EDWARD DACY.

89.     On or about January 29, 2010, defendant EDWARD DACY and others at the settlement company handled the closing on Johnson's purchase of 1112 50th Street, NE, settling the transaction without collecting the buyer's cash contribution as required by the lender; in addition, the Settlement Statement contained the forged signature of FTR, purporting to be a managing partner of the seller.

90.     On or before January 29, 2010, defendant EDWARD DACY created and caused to be created a Deed transferring 1112 50th Place, NE, from a general partnership controlled by Davis to Johnson.

91.     Between on or about January 29, 2010, and February 3, 2010, in the District of Columbia and elsewhere, defendant EDWARD DACY and Morrison caused an executed Deed to be filed at the District of Columbia's Recorder of Deeds, with the instructions that after the

recordation of the deed, the Recorder of Deeds should mail the stamped documents back to Settlement Company A.

92.     On or about February 3, 2010, in the District of Columbia and elsewhere, the District of Columbia's Recorder of Deeds mailed the file-stamped copy of the Deed, referenced above, to Settlement Company A.

93.     At some point after January 2010, Davis, Johnson, and others failed to pay the mortgage on 1112 50th Street, NE, resulting in the default of the loan and foreclosure of the property.

**(Conspiracy to Commit Bank Fraud, Mail Fraud, and Wire Fraud, in violation of Title 18, United States Code, §§ 371, 1344, 1341, and 1343).**

## COUNT TWO

## BANK FRAUD

94.     From in or about 2005, and ending in or about November 2009, defendants EDWARD DACY and CONRAD AUSTIN devised a scheme and aided and abetted a scheme to defraud National City Mortgage, a wholly owned subsidiary of National City Bank, and to obtain moneys, funds, credits, and other property owned by or under the custody or control of National City Mortgage, a wholly owned subsidiary of National City Bank, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises.

95.     Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged and contain the description of the above-mentioned scheme.

96.     From in or about 2005 and ending in or about November 2009, in the District of Columbia and elsewhere, defendants EDWARD DACY and CONRAD AUSTIN executed and

attempted to execute the scheme and artifice as set forth above, as more fully described in Paragraphs 1 through 16 and 18 through 93 of Count One of the indictment.

**(Bank Fraud and Aiding and Abetting,
in violation of Title 18, United States Code, §§ 1344 and 2).**

## COUNT THREE

## BANK FRAUD

97.     From in or about 2005 to at least 2010, defendant EDWARD DACY devised a scheme and aided and abetted a scheme to defraud MetLife Home Loans, a wholly owned subsidiary of MetLife Bank, and to obtain moneys, funds, credits, and other property owned by or under the custody or control of MetLife Home Loans, a wholly owned subsidiary of MetLife Bank, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises.

98.     Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged and contain the description of the above-mentioned scheme.

99.     Between in or about 2005 to at least in or about 2010, in the District of Columbia and elsewhere, defendant EDWARD DACY executed and attempted to execute the scheme and artifice as set forth above, as more fully described in Paragraphs 1 through 16 and 18 through 93 of Count One of the indictment.

**(Bank Fraud and Aiding and Abetting,
in violation of Title 18, United States Code, §§ 1344 and 2).**

## COUNT FOUR

## BANK FRAUD

100.     From in or about 2005 to at least in or about March 2008, defendant EDWARD DACY devised a scheme and aided and abetted a scheme to defraud Resource Bank, and to obtain

moneys, funds, credits, and other property owned by or under the custody or control of Resource Bank, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises.

101.   Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged and contain the description of the above-mentioned scheme.

102.   Between in or about 2005 to at least in or about March 2008, in the District of Columbia and elsewhere, defendant EDWARD DACY executed and attempted to execute the scheme and artifice as set forth above, as more fully described in Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment.

**(Bank Fraud and Aiding and Abetting,
in violation of Title 18, United States Code, §§ 1344 and 2).**

## COUNT FIVE

### BANK FRAUD

103.   From in or about 2005 to at least in or about April 2009, defendant EDWARD DACY devised a scheme and aided and abetted a scheme to defraud Countrywide Bank and to obtain moneys, funds, credits, and other property owned by or under the custody or control of Countrywide Bank, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises.

104.   Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged and contain the description of the above-mentioned scheme.

105.   Between in or about 2005 to at least in or about April 2009, in the District of Columbia and elsewhere, defendant EDWARD DACY executed and attempted to execute the scheme and artifice as set forth above, as more fully described in Paragraphs 1 through 16 and 18

through 93 of Count One of this indictment.

**(Bank Fraud and Aiding and Abetting,
in violation of Title 18, United States Code, §§ 1344 and 2).**

## COUNT SIX

### BANK FRAUD

106.    From in or about 2005 to at least in or about December 2009, defendant EDWARD

DACY devised a scheme and aided and abetted a scheme to defraud AmTrust Bank and to obtain

moneys, funds, credits, and other property owned by or under the custody or control of

Countrywide Bank, whose deposits were insured by the Federal Deposit Insurance Corporation,

by means of materially false and fraudulent pretenses, representations, and promises.

107.    Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are

hereby realleged and contain the description of the above-mentioned scheme.

108.    Between in or about 2005 to at least December 2009, in the District of Columbia

and elsewhere, defendant EDWARD DACY executed and attempted to execute the scheme and

artifice as set forth above, as more fully described in Paragraphs 1 through 16 and 18 through 93

of Count One of this indictment.

**(Bank Fraud and Aiding and Abetting,
in violation of Title 18, United States Code, §§ 1344 and 2).**

### COUNTS SEVEN THROUGH FIFTEEN

### WIRE FRAUD

109.    From in or about 2005 until in or about November 2009, within the District of

Columbia and elsewhere, defendants EDWARD DACY and CONRAD AUSTIN devised and

intended to devise and aided and abetted a scheme to defraud a financial institution and to obtain

money and property by means of materially false and fraudulent pretenses, representations, and

promises, from the financial institution by obtaining mortgage loans and assisting others to obtain mortgage loans on residential real estate properties through material misrepresentations and false statements on loan applications and documents, and using fraudulent settlements, with such sales generating large cash proceeds and ownership in real property, and ultimately causing a loss to the financial institution when mortgages were not paid, as more fully described below.

110.    Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged, and contain the description of the above-mentioned scheme.

111.    On or about the dates listed below, in the District of Columbia and elsewhere, the defendants CONRAD AUSTIN and EDWARD DACY for the purpose of executing and attempting to execute and aiding and abetting the execution of the above-described scheme to defraud affecting a financial institution, did willfully cause to be transmitted by means of wire communication in interstate commerce from the District of Columbia to the State of Maryland certain writings, signals, and sounds, that is, facsimiles of documents submitted on behalf of loan applications, for properties listed below, to National City Mortgage, a wholly owned subsidiary of National City Bank, a  financial institution:

| COUNT | DATE | PROPERTY | DESCRIPTION |
|---|---|---|---|
| SEVEN | 6/6/2008 | 2505 Queens Chapel Road, NE | Loan Application (Davis) |
| EIGHT | 6/10/2008 | 2505 Queens Chapel Road, NE | Rental Lease (Davis) |
| NINE | 6/21/2008 | 2505 Queens Chapel Road, NE | CPA Letter (Davis) |
| TEN | 7/8/2008 | 1807 M Street, NE | CPA Letter (Robinson) |
| ELEVEN | 7/21/2008 | 2505 Queens Chapel Road, NE | CPA Letter (MAF) |
| TWELVE | 7/21/2008 | 826 20th Street, NE | CPA Letter (MAF) |
| THIRTEEN | 8/8/2008 | 826 20th Street, NE | Tax Returns (Robinson) |

| FOURTEEN | 8/8/2008 | 1807 M Street, NE | Loan Application (Robinson) |
| FIFTEEN | 12/23/2008 | 1807 M Street, NE | Gift Letter (FTR) |

**(Wire Fraud Affecting a Financial Institution,**
**in violation of Title 18, United States Code, § 1343).**

## COUNTS SIXTEEN THROUGH NINETEEN

### MAIL FRAUD

112.    From in or about 2005 until in or about November 2009, within the District of Columbia and elsewhere, defendants EDWARD DACY and CONRAD AUSTIN devised and intended to devise and aided and abetted a scheme to defraud financial institutions and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, from financial institutions by obtaining mortgage loans and assisting others to obtain mortgage loans on residential real estate properties through material misrepresentations and false statements on loan applications and documents, and using fraudulent settlements, with such sales generating large cash proceeds and ownership in real property, and ultimately causing a loss to the financial institutions when mortgages were not paid, as more fully described below.

113.    Paragraphs 1 through 16 and 18 through 93 of Count One of this indictment are hereby realleged and contain the description of the above-mentioned scheme.

114.    On or about the dates listed below, in the District of Columbia and elsewhere, defendants listed below for the purpose of executing and attempting to execute and aiding and abetting the execution of the above-described scheme to defraud affecting a financial institution and obtaining money and property by materially false and fraudulent pretenses, representations, and promises, did knowingly cause to be delivered by the United States Postal Service and by a private and commercial interstate carrier, from the District of Columbia's Recorder of Deeds

24

located in the District of Columbia, to the Commonwealth of Virginia (specifically, to Settlement

Company A), mail matter, that is, file-stamped deeds transferring the properties (addresses listed

below, all being in the District of Columbia) to the straw buyers or co-conspirators listed below:

| COUNT | DEFENDANT | DATES | PROPERTY | STRAW BUYER | BANK |
|-------|-----------|-------|----------|-------------|------|
| SIXTEEN | DACY | 1/16/2008 | 222 Seaton Place, NE | RS | Countrywide Bank |
| SEVENTEEN | DACY / AUSTIN | 8/14/2008 | 2505 Queens Chapel Road, NE | MAF | National City Mortgage |
| EIGHTEEN | DACY / AUSTIN | 10/2/2008 | 826 20th Street, NE | Robinson | National City Mortgage |
| NINETEEN | DACY | 2/3/2010 | 1112 50th Street, NE | Johnson | MetLife |

**(Mail Fraud Affecting a Financial Institution,
in violation of Title 18, United States Code, § 1341).**

## FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in this indictment, defendants shall

forfeit to the United States any property constituting, or derived from, proceeds defendants

obtained directly or indirectly, as the result of these offenses, pursuant to 18 U.S.C. §

982(a)(2)(A). The United States will seek a forfeiture money judgment against defendants equal

to the value of any property constituting, or derived from, any proceeds obtained, directly or

indirectly, as the result of these offenses.

2.      If any of the property described above as being subject to forfeiture, as a result of

any act or omission of defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without

difficulty;

defendants shall forfeit to the United States any other property of defendants, up to the value of

the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code,
Section 982(a)(2)(A), and Title 21, United States Code, Section 853(p)).**

A TRUE BILL

FOREPERSON.

Ronald C. Machen Jr. /DLL

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA